UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA McDONALD,

    Plaintiff,                               Case No. 13-14105

v.                                       Hon. Gerald E. Rosen

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

**OPINION AND ORDER REGARDING
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on       March 31, 2015      

PRESENT: Honorable Gerald E. Rosen
                         Chief Judge, United States District Court

## I. INTRODUCTION

Plaintiff Lisa McDonald commenced this action in this Court on September 26, 2013, challenging the final decision of the Defendant Commissioner of Social Security to deny Plaintiff's applications for disability insurance benefits and supplemental security income under the Social Security Act (the "Act"). This Court's subject matter jurisdiction rests upon Plaintiff's assertion of the right of judicial review conferred under the Act. *See* 42 U.S.C. § 405(g).

Through the present cross-motions, Plaintiff and Defendant request that the Court

reverse or affirm, respectively, the decision of an Administrative Law Judge following a hearing that Plaintiff is not disabled within the meaning of the Act.  Having reviewed the parties' motions and the underlying administrative record, the Court finds that the relevant allegations, facts, and legal issues are sufficiently presented in these written submissions, and that oral argument would not aid the decisional process.  Accordingly, the Court will decide the parties' cross-motions "on the briefs."  *See* Local Rule 7.1(f)(2), U.S. District Court, Eastern District of Michigan.  For the reasons set forth below, the Court denies Plaintiff's motion for summary judgment and grants Defendant's motion for summary judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

**A.   Procedural History**

On November 24, 2010, Plaintiff Lisa McDonald filed applications for disability insurance benefits and supplemental security income under the Act, alleging a disability onset date of May 30, 2010.  (*See* Admin. Record ("AR") at 153-56, 157-63.)  Following the initial denials of these applications in May of 2011, (*see id.* at 81-82, 94-95), Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), (*see id.* at 109-10).

On April 10, 2012, Plaintiff appeared with counsel at an administrative hearing before ALJ Earl A. Witten.  (*See id.* at 32-69.)  Plaintiff testified at the hearing, and the ALJ also heard testimony from a vocational expert ("VE"), James Engelkes.  On May 10, 2012, the ALJ issued a written decision finding that Plaintiff was not disabled within the meaning of the pertinent provisions of the Act, (*see id.* at 14-26), and the Appeals Council

thereafter denied Plaintiff's request for administrative review of the ALJ's decision, (*see id.* at 1-3). Through the present suit filed on September 26, 2013, Plaintiff now seeks judicial review of the ALJ's unfavorable decision.

**B.    Medical Evidence**

The ALJ determined that Plaintiff suffered from the severe impairments of degenerative disc disease, anxiety disorder, affective disorder, and personality disorder. (*See id.* at 19.) The following is a summary of the medical evidence relating to these impairments.

In May of 2010, Plaintiff sought treatment from a chiropractor, Eldon Newmyer, D.C., and an osteopathic physician, Roger Holman, D.O., after a horse fell on her as she was tending to it. (*See id.* at 249, 301-02.) Plaintiff was seen at Dr. Holman's office on May 10, 2010, shortly after this injury, and she reported a pain level of 7-8 out of 10, difficulty in sleeping, and leg and back spasms. (*Id.* at 249.) Her physician noted that she had been off work for a week, and was given a note to remain off work the following week. (*Id.*) At a follow-up visit on May 17, 2010, Plaintiff stated that she remained "extremely sore" and that it was "difficult" to walk, and examination revealed "significant tenderness over the thoracic and lumbar musculature." (*Id.* at 248.)

Plaintiff was referred for an MRI on May 24, 2010, which revealed "significant degenerative changes at L4-5" and "mild diffuse bulging of the L4-5 intervertebral disc" but "no spinal canal stenosis, focal disc herniations, or significant nerve exit foraminal narrowing." (*Id.* at 257-58.) Likewise, a July 5, 2010 X-ray study of Plaintiff's lumbar

3

spine disclosed a "partially sacralized transitional fifth lumbar vertebra" and "significant degenerative changes at the junction between L4 and the transitional vertebra, with marked disk space narrowing and facet arthrosis," but "no finding suspicious for acute fractures." (*Id.* at 256.) In her visits to Dr. Holman's office following the MRI, Plaintiff continued to report significant levels of pain and discomfort and difficulty in sleeping, and her physician prescribed medications to alleviate her pain and sleeplessness, provided notes so that she could remain off work, and referred her for consultation with a neurosurgeon. (*See id.* at 247-48.)

On July 7, 2010, Plaintiff was seen by neurosurgeon John F. Keller, M.D. Upon examination, Dr. Keller found that Plaintiff was neurologically "alert and oriented," that "[c]ranial nerves II-XII [we]re intact," that her motor strength was "5/5," and that her gait was normal. (*Id.* at 224.) Dr. Keller observed that a recent MRI had revealed "degenerative changes in the disc space at L4-5," but he did not "recommend surgery at this point" as he saw no "new disc herniation, stenosis, or nerve root compression." (*Id.*) Instead, Dr. Keller referred Plaintiff to a physiatrist, Derek Lado, D.O., for "oversight of epidural steroids and physical therapy." (*Id.*)

Dr. Lado of Michigan Pain Consultants examined Plaintiff on four occasions between September and January of 2011. At the first visit on September 27, 2010, Dr. Lado opined that "[p]hysical exam was difficult because of [Plaintiff's] significant pain," and that this pain appeared to "have a radicular component" but "it was difficult to test." (*Id.* at 226.) Dr. Lado recommended epidural injections and an EMG of Plaintiff's lower

extremities, and noted that Plaintiff wished to remain on her existing medications of Darvocet, Valium, and Baclofen. (*Id.*) In subsequent visits, Dr. Lado reported that a nerve conduction study produced results in the normal range, that "[a]n EMG did not show any nerve compression or axonal changes," and that Plaintiff "did not do well at all" with an epidural injection but instead complained of "increased pain." (*Id.* at 227, 231.) At a December 13, 2010 visit with Dr. Lado, Plaintiff expressed frustration with her level of pain and indicated that neither medications nor injections were helping her, and she inquired if back surgery or fusion would provide relief. (*Id.* at 231.) Dr. Lado agreed that a second opinion was appropriate, but explained to Plaintiff that if she was "under the impression that back surgery can fix and solve all her problems and make her 100%, . . . that is not realistic." (*Id.*)[1]

On May 9, 2011, a consultative examiner, R. Scott Lazzara, M.D., conducted a physical examination of Plaintiff and found that she "had no difficulty getting on and off the examination table, no difficulty heel and toe walking, no difficulty squatting, and no difficulty hopping." (*Id.* at 266.) Range-of-motion studies conducted by Dr. Lazzara showed results within the normal range. (*See id.* at 267-68.) Regarding Plaintiff's complaints of chronic back pain, Dr. Lazzara noted that Plaintiff "did have a paravertebral spasm today with diminished range of motion" and that she "walk[ed] with

---

[1]Dr. Lado further stated that he would send Plaintiff to a colleague, Dr. Timothy Spencer, "for an evaluation in regards to if a lumbar fusion would actually help her function, help her ride a horse, [or] help her get back to work," (*id.*), but he indicated in a later January 28, 2011 report that Plaintiff was "unable to see" Dr. Spencer," (*id.* at 281).

5

a guarded gait," but he observed that Plaintiff nonetheless "continue[d] to try to be somewhat physically active by taking care of horses and walking." (*Id.* at 269.) Dr. Lazzara opined that the medical record "suggests either scar tissue formation or myofascial pain" as the source of Plaintiff's complaints, and he concluded more generally that Plaintiff's "degree of [physical] impairment appears mild but does appear to be slowly declining and would be remediable with more aggressive treatment." (*Id.*)

Turning to the evidence of Plaintiff's mental impairments, Plaintiff was evaluated in June of 2008 by psychologist Robert J. Fabiano, who diagnosed her with dissociative disorder. (*Id.* at 288-94.) Dr. Fabiano observed that Plaintiff "drove herself to the evaluation and arrived promptly," that she was "appropriately dressed" and "demonstrated good hygiene," and that her "[t]hinking was coherent, clear, and logical." (*Id.* at 289.) Plaintiff also "demonstrated normal memory abilities," her "[c]onversational speech was spontaneous, fluent, and articulate," and she had a full scale IQ of 104, which placed her in the 61st percentile. (*Id.* at 290-91.) Testing revealed, however, that Plaintiff exhibited "[l]ow average to borderline abilities . . . in areas related to speed of mental processing, attention, concentration, and freedom from distractibility," which suggested to Dr. Fabiano that Plaintiff "may have difficulty sustaining attention and working towards task completion." (*Id.* at 291.) In addition, Dr. Fabiano found deficits in Plaintiff's reading and writing abilities, and he assigned her a Global Assessment of

Functioning ("GAF") score of 58.  (*Id.* at 292, 294.)[2]

In March of 2011, a State of Michigan consultative examiner, Dennis L. Mulder, Ed.D., evaluated Plaintiff and diagnosed her with post traumatic stress disorder and dysthymic disorder.  (*See* AR at 261-64.)  Dr. Mulder assigned Plaintiff a GAF score in the range of 51-55, and found that she was "able to understand, retain and follow simple instructions."  (*Id.* at 264.)  Dr. Mulder opined, however, that "a return to performing simple, routine, repetitive tasks at the present time may leave to a further de-compensation," and he recommended that Plaintiff's "prognosis may improve with a psychiatric review of medications and consistent participation in cognitive behavioral therapy."  (*Id.*)

**C. Plaintiff's Testimony at the Administrative Hearing**

At the April 10, 2012 hearing before ALJ Witten, Plaintiff testified that she was 37 years old, was married, and had a 15-year-old child and two stepchildren aged nine and seven.  (*Id.* at 36-37.)  Plaintiff is a high school graduate and has a driver's license, but she testified that she drives "[m]aybe twice a week, if that," and only very short distances. (*Id.* at 38-39.)

Plaintiff testified that she last worked in May of 2010, and she described her most recent work for Bradford White Corporation as in a "labor bank," where she would fill in

---

[2]As explained by the Sixth Circuit, a GAF score "is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Commissioner of Social Security,* No. 04-2171, 167 F. App'x 496, 503 n.7 (6th Cir. Feb. 9, 2006).  A score within the range of 51-60 "indicates moderate symptoms or moderate difficulty in social or occupational functioning." *Kornecky,* 167 F. App'x at 511.

for other employees who were absent on a given day. (*Id.* at 39-40.) She performed the duties of this position almost exclusively on her feet, and occasionally had to lift up to 120 pounds. (*See id.* at 41.) Similarly, a prior position with Flex Fab required Plaintiff to work on her feet, and Plaintiff testified that she routinely lifted up to 75 pounds on that job. (*See id.* at 42.)

According to Plaintiff, the medical condition that most affects her ability to work is "[t]he L4, L5 disc that's periodically herniating, or most herniated." (*Id.* at 44.) Plaintiff testified that this condition causes spasms in both legs and pain on a daily basis that she rated as a level 8 on a scale of one to ten. (*Id.* at 44-45.) Plaintiff further stated that she treats this condition with "what I've got left of my medication,"[3] and that the physicians she had seen were unwilling to operate on her. (*Id.* at 46-47.) Plaintiff also identified arthritis in both arms as contributing to her inability to work, but she stated that her current doctors were not doing anything to treat this condition. (*Id.* at 48.) In addition, Plaintiff testified that she has "ribs that pop out of place," and that while her chiropractor treats this condition, the ribs "pop back out" about "a half an hour" after she leaves the chiropractor's office. (*Id.* at 51, 53.)

Regarding her mental condition, Plaintiff testified that she suffers from depression that causes her to "cry a lot" and prevents her from "play[ing] with my children" and "do[ing] the things that I would like to be doing," such as riding horses. (*Id.* at 50.)

---

[3] Plaintiff explained that she no longer had medical insurance and could not afford any more prescription medication. (*Id.* at 46.)

8

Plaintiff stated, however, that she does not take any medication for this condition. (*Id.*)

Plaintiff testified that she can sit comfortably for about "10 minutes, if that long," and that she likewise can remain standing in one place for "maybe 10 minutes, if that." (*Id.* at 53-54.) Plaintiff further stated that she can walk only about 10 feet before she has to stop and rest due to the pain, and that she can lift only a "[c]ouple pounds." (*Id.* at 54.) She testified that activities such as bending, stooping, crouching, kneeling, crawling, or climbing stairs would cause her increased pain. (*See id.*) In addition, Plaintiff stated that she relies on her husband and family to bathe her and help her get dressed, and that her husband "has to do 99 percent of the cooking." (*Id.* at 56.) Plaintiff testified that she does no household chores, but that she sometimes accompanies her husband and children for grocery shopping and attends church up to twice a week. (*See id.* at 56-57.)

On questioning by her attorney, Plaintiff stated that she is most comfortable while lying down, and that she can remain in that position for about 30 minutes. (*See id.* at 61.) She testified that she does not sleep well, and that she wakes up every two hours to reposition herself. (*See id.* at 61-62.) Finally, Plaintiff stated that her medications make her drowsy and cause burning pain in her stomach. (*See id.* at 62.)

**D.     The Findings of the Administrative Law Judge**

In a May 10, 2012 decision, ALJ Witten found that Plaintiff was not disabled within the meaning of the pertinent provisions of the Social Security Act. (*See id.* at 17-26.) The ALJ determined that Plaintiff suffered from the severe impairments of degenerative disc disease, anxiety disorder, affective disorder, and personality disorder,

9

but found that these impairments did not meet or medically equal the criteria for any impairment listed in the Social Security regulations. (*See id.* at 19-21.)

The ALJ next assessed Plaintiff's residual functional capacity ("RFC"), determining that Plaintiff could perform a limited range of sedentary work. In particular, the ALJ imposed the following limitations on Plaintiff's ability to perform sedentary work: (i) no overhead work or work requiring the use of foot controls, (ii) only occasional bending, twisting, and turning, (iii) no climbing, crawling, squatting, or kneeling; (iv) no work involving the use of air or vibrating tools, dangerous machinery, or tasks performed at dangerous heights, (v) work that allows Plaintiff to sit and stand at will, and (vi) unskilled work involving only simple, repetitive tasks. (*See id.* at 21.)

Next, the ALJ determined that Plaintiff was unable to perform any of her past relevant jobs, which the ALJ characterized as heavy or light-to-heavy, semiskilled work. (*See id.* at 24.) In light of the testimony of VE James Engelkes at the administrative hearing, however, the ALJ found that Plaintiff was capable of performing a significant number of jobs that exist in the regional economy. (*See id.* at 24-25.) Consequently, the ALJ concluded that Plaintiff was not disabled under the Act.

### III. ANALYSIS

A.  The Standards Governing the Court's Review of the ALJ's Decision

Under 42 U.S.C. § 405(g), an applicant for benefits such as Plaintiff here may seek judicial review of a final decision by the Defendant Commissioner of Social Security, and

the Court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing" the Commissioner's decision. In conducting this review, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Commissioner of Social Security,* 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks and citations omitted). The requisite "substantial evidence" to support the Commissioner's decision "is defined as more than a scintilla of evidence but less than a preponderance," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks and citation omitted). This standard does not demand that "this [C]ourt agree with the Commissioner's finding, as long as it is substantially supported in the record." *Rogers,* 486 F.3d at 241.

In determining whether the Defendant Commissioner's decision is supported by substantial evidence, the Court "do[es] not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon,* 499 F.3d 506, 509 (6th Cir. 2007). Rather, it is the task of "the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers,* 486 F.3d at 247. Moreover, "[w]hile it might be ideal for an ALJ to articulate his reasons for crediting or discrediting" each item in the evidentiary record, there is no requirement that the ALJ "directly address[] in his written decision every piece of evidence submitted by a party."

*Kornecky,* 167 F. App'x at 507-08 (internal quotation marks and citation omitted). "Nor must an ALJ make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that he implicitly resolved such conflicts." *Kornecky,* 167 F. App'x at 508 (internal quotation marks and citation omitted).

**B.      Plaintiff Has Failed to Identify a Basis for Reversing the Decision of the Defendant Commissioner To Deny Her Applications for Benefits.**

In seeking to overturn the ALJ's decision that she is not disabled within the meaning of the Social Security Act, Plaintiff appears to rely exclusively on the argument that the hypothetical question formulated by the ALJ and presented to the VE did not accurately incorporate each of her impairments. As correctly observed by Defendant, however, Plaintiff has largely failed to marshal any evidence in support of this challenge to the ALJ's hypothetical question, nor has she identified any legal infirmity in the ALJ's assessment of Plaintiff's credibility or determination of the weight to be given to the evidence in the medical record. Moreover, even assuming that Plaintiff's undeveloped argument did not constitute a waiver of her challenge to the ALJ's decision, the Court agrees with Defendant that substantial evidence supports the ALJ's determination of Plaintiff's RFC and use of this RFC in formulating hypothetical questions for the VE.

Plaintiff's brief in support of her summary judgment motion is aptly characterized as boilerplate recitations of governing legal principles culled from various Sixth Circuit decisions and Social Security rulings and regulations, interspersed with the occasional conclusory assertion that the challenged decision here fails to comport with these legal

standards.  Plaintiff points, for example, to the Sixth Circuit's recognition that an appropriate hypothetical question must "accurately describe[] the plaintiff in all significant, relevant respects," *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994), but then declares, without elaboration or citation to the record, that the hypothetical question posed by the ALJ here "does not accurately describe [Plaintiff] in all significant, relevant respects," (Plaintiff's Motion, Br. in Support at 8).  Plaintiff then devotes the next page of her brief to a recitation of the standards governing the weight to be given to a treating physician's opinion and the evaluation of complaints of pain, (*see id.* at 8-9), but nowhere in the discussion that follows does Plaintiff attempt to explain how the ALJ's decision might deviate from these standards.  Rather, Plaintiff's brief concludes by recounting her own testimony at the administrative hearing regarding her limitations, (*see id.* at 9-10), without acknowledging — much less identifying any error in — the ALJ's findings that this testimony was not credible in certain respects, (*see* AR at 23-24).

As noted by Defendant, a number of other decisions in this District have held that undeveloped arguments of this sort — made in each case by the very same attorney, Richard J. Doud, who is representing Plaintiff here — do not warrant further consideration, but instead amount to a waiver.  In *Burger v. Commissioner of Social Security,* No. 12-11763, 2013 WL 2285375, at *5 (E.D. Mich. May 23, 2013) (internal quotation marks and citation omitted), for example, Magistrate Judge Majzoub observed that a summary judgment brief prepared by the plaintiff and his counsel, Mr. Doud, was "completely devoid of any discernable legal argument" and left the court to "wonder why

13

[the plaintiff] thinks the ALJ should have been required to find him credible." Similarly, in *Long v. Commissioner of Social Security,* No. 13-14879, 2015 WL 1245927, at *5 (E.D. Mich. March 18, 2015) (internal quotation marks, alteration, and citation omitted), Mr. Doud filed a summary judgment brief on behalf of his client that, like the brief filed here, "consist[ed] almost entirely of a compilation of quotations of black letter case law, with little accompanying analysis or application of that law to the facts of [the] case," and Magistrate Judge Grand expressed frustration that this brief did not "explain with any particularity whatsoever *which* medical records the ALJ purportedly failed to properly evaluate, or *why* the ALJ should not have discounted [the plaintiff's] credibility, or exactly *how* the ALJ's hypothetical was deficient." As recently observed by Magistrate Judge Morris, Mr. Doud's "use of similar, often verbatim, arguments in other cases ha[s] garnered a thickening stack of court opinions questioning whether to deem them waived." *Brewer v. Commissioner of Social Security,* No. 13-14409, 2014 WL 6632176, at *14 (E.D. Mich. Nov. 21, 2014) (footnote with citations to 19 cases omitted).

Indeed, this Court itself has expressly cautioned Plaintiff's counsel that advocacy of this sort is inappropriate and will not be tolerated. In *Fielder v. Commissioner of Social Security,* No. 13-10325, 2014 WL 1207865, at *1-*2 (E.D. Mich. March 24, 2014), this Court declined to address objections lodged by the plaintiff and his counsel, Mr. Doud, to a report and recommendation issued by Magistrate Judge Majzoub, where these objections raised issues that were not fairly presented for the Magistrate Judge's consideration in the plaintiff's underlying motion for summary judgment. Upon

surveying the conclusory statements and perfunctory arguments made in this underlying motion, this Court pointedly observed:

> . . . [T]his reliance on conclusory assertions and absence of developed argument has become the calling card of Plaintiff's counsel in a number of recent Social Security cases, and nearly every Magistrate Judge in this District has expressed this concern with the work product of Plaintiff's counsel. In light of this lamentable record of filing one-size-fits-all briefs and inviting the Judges of this District to formulate arguments and search the record on his clients' behalf, Plaintiff's counsel is strongly cautioned that this Court will carefully examine his submissions in future suits to ensure that they advance properly supported arguments that rest upon (and cite to) the facts of a particular case. Failure to adhere to these standards will result in the imposition of sanctions and possible referral of counsel for disciplinary proceedings.

*Fielder,* 2014 WL 1207865, at *1 n.1 (citations to six cases omitted). Because the summary judgment brief filed by Plaintiff and her counsel in this case suffers from precisely these same deficiencies noted in a wealth of prior rulings by the Judges of this District, this Court readily concludes that Plaintiff has waived her challenges to the ALJ's decision.[4]

In any event, even assuming that Plaintiff and her counsel had appropriately

---

[4] The Court notes that Plaintiff's summary judgment motion in this case was filed shortly before this Court issued its ruling in *Fielder.* Due to the lack of fair warning, the Court declines to impose the sanctions threatened in this earlier decision. Rather, the Court instead reiterates its admonition in *Fielder* that the future work product of Plaintiff's counsel will be closely scrutinized "to ensure that [it] advance[s] properly supported arguments that rest upon (and cite to) the facts of a particular case." *Fielder,* 2014 WL 1207865, at *1 n.1. As observed by another Judge in this District, counsel has done considerable damage to his professional reputation by "submitting briefs on behalf of social security claimants that are thoroughly deficient and devoid of proper factual substance and legal analysis," *Sadler v. Commissioner of Social Security,* No. 13-13552, 2014 WL 4724767, at *6 (E.D. Mich. Sept. 23, 2014), and counsel would be well advised to promptly adopt significant measures to repair this damage.

15

analyzed the pertinent law and applied it to the facts of this case, the Court nonetheless finds that the ALJ's decision passes muster under these standards. So far as can be discerned from her motion, Plaintiff's chief complaint is that the ALJ did not adequately account for her testimony at the administrative hearing in determining Plaintiff's RFC and formulating a hypothetical question for the VE. She points, for example, to her testimony that she cannot sit or stand for more than ten minutes due to back pain, and that her daily activities are extremely limited. Yet, as Defendant points out, the ALJ did not altogether reject Plaintiff's testimony as to her limitations, but instead incorporated portions of this testimony by, for example, limiting her to work that allows her to sit and stand at will. (*See* AR at 21.) Moreover, to the extent that the ALJ did not fully credit Plaintiff's testimony, he identified sufficient grounds for doing so, including (i) inconsistencies between her testimony at the administrative hearing regarding her daily activities and her report to Dr. Lazzara in May of 2011 that she cooked, did some light household chores, homeschooled her children, could sit for about half an hour, had no problem standing, and could walk most of the day, (ii) inconsistent medical findings as to the severity of her back impairment, (iii) the lack of evidence that Plaintiff sought significant treatment for her mental impairments, and (iv) Plaintiff's January 20, 2011 statement to her treating physician, Dr. Holman, that she planned to seek other work. (*See id.* at 24.) These are recognized bases in the law for discounting the subjective complaints of a claimant. *See, e.g., Walters v. Commissioner of Social Security,* 127 F.3d 525, 531-32 (6th Cir. 1997) (noting that inconsistencies in the medical record concerning the severity of a claimant's

impairments can lead to "more than one reasonable conclusion," thereby allowing more leeway in an ALJ's exercise of his discretionary authority to assess the claimant's credibility); *Blacha v. Secretary of HHS,* 927 F.2d 228, 231 (6th Cir. 1990) (recognizing that "an ALJ may consider household and social activities in evaluating complaints of disabling pain," and that a claimant's failure to seek treatment also may provide a basis for discounting her testimony as to debilitating ailments or pain).

Finally, while Plaintiff seemingly suggests that the ALJ failed to give sufficient weight to the opinions of her treating physicians, she once again fails to engage with the ALJ's analysis of this very question. For example, while the ALJ acknowledged Dr. Holman's statement in a January 21, 2011 letter that Plaintiff was "totally and permanently disabled," (AR at 295), he explained that he gave this opinion "little weight" because (i) it expressed a view on "a matter reserved to the Commissioner," (ii) Dr. Holman's contemporaneous treatment notes revealed that he issued this letter in response to Plaintiff's request that for "liability purposes," she needed a note stating that she was "totally and permanently disabled," and (iii) at the time Dr. Holman wrote this letter, Plaintiff had told this physician that "she intended to find other work." (*Id.* at 23.) Likewise, the ALJ recognized that Plaintiff's treating chiropractor, Dr. Newmyer, stated his belief that Plaintiff would "never be able to work another day in her life," (*id.* at 303), but he again gave this opinion "little weight" because (i) it was "relatively unsupported by objective findings," (ii) there was a "gap . . . of almost two years" in the record of Dr. Newmyer's treatment of Plaintiff, and (iii) "as a chiropractor[,] Dr. Newmyer is not an

17

acceptable medical source." (*Id.* at 23.) These are permissible grounds for discounting a treating physician's opinion that a claimant suffers from a disabling impairment, *see Bass,* 499 F.3d at 511-12 (holding that the ALJ in that case had "properly rejected" a treating physician's "conclusion of disabling back pain," where "controlling weight will not be provided to a treating physician's opinion on an issue reserved to the Commissioner," and where this opinion was inconsistent with the treating physician's own statements on other occasions and with the opinions of other evaluators), and Plaintiff does not contend otherwise. Nor, more generally, does Plaintiff identify any basis for this Court to disturb the ALJ's findings as to the weight to be given to the evidence in the medical record.

## IV. **CONCLUSION**

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Plaintiff's February 24, 2014 motion for summary judgment (docket #11) is DENIED, and that Defendant's May 8, 2014 motion for summary judgment (docket #14) is GRANTED.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated: March 31, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on March 31, 2015, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135